***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Baddour and the briefs and arguments of the parties. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, and having reviewed the competent evidence of record, the Full Commission affirms the Opinion and Award of Deputy Commissioner Baddour with minor modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS *Page 2 
1. All parties are properly before the Industrial Commission, and the Industrial Commission has jurisdiction over the parties and the subject matter.
2. All parties have been correctly designated, and there is no question as to misjoinder or nonjoinder of parties.
3. This case is subject to the North Carolina Workers' Compensation Act.
4. An employment relationship existed between the plaintiff and the defendant-employer Bright Enterprises, and Stonewood Insurance Co. was the insurer on the risk on the date of injury of October 3, 2007.
5. On October 3, 2007, plaintiff suffered an injury to her right middle finger. Plaintiff also contends she suffered an injury to her right hand, upper extremity and neck, which defendants denied.
 ***********
Based upon the competent evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff is 50 years old. She began working for Defendant-Employer Bright Enterprises in 2000.
2. Plaintiff worked for Defendant-Employer as a Hot Stamp Operator. To operate the hot stamp machine, Plaintiff was required to change hot stamp pads, label material, hold fixtures with the proper tools, loosen and tighten fixtures, and adjust the machine.
3. On September 28, 2007, employees for Defendant-Employer moved the hot stamp machine a few feet. After the machine was moved, it was not running properly due to the shaker pans being out of sync. On October 3, 2007, Plaintiff attempted to adjust the shakers to improve the running of the machine. This was done by turning shaker bolts with a ratchet wrench. *Page 3 
4. Plaintiff testified that two separate incidents occurred while she was adjusting the shakers on October 3, 2007. The first incident occurred when the machine came on while Plaintiff was adjusting a shaker, throwing her hand downward and causing the knuckle of the middle finger of her right hand to strike the edge of the machine. This caused a small cut. No stitches were needed. Plaintiff reported the incident to her supervisor, bandaged her finger, and returned to work without seeking medical attention. This first incident was accepted as compensable by defendants.
5. Plaintiff testified that she does not believe the first incident is the cause of her ongoing problems. After the first incident, Plaintiff returned to work. She was working with the ratchet adjusting the shakers when she suddenly felt a pain in her hand that went up her arm and into her neck. Plaintiff was pushing down to tighten the shaker when she felt the pain. Plaintiff also reported this second incident to her supervisor but did not seek medical attention at the time. On October 16, 2007, approximately two weeks later, Plaintiff first sought medical treatment at Urgent Medical Family Care.
6. Plaintiff testified at the hearing before the Deputy Commissioner that her pain has not improved since the incidents at work. Rather, her pain has increased, moving all the way across her shoulders and down her low back. Plaintiff described her pain as a burning sensation and a rollercoaster in her knuckles and that it feels as if she is touching a raw nerve when touching the middle of her finger. Plaintiff complained of swelling in the palm of her hand and in her middle and ring fingers, and of knuckle and hand discoloration. Plaintiff contended that her biceps and forearms are tight and stiff and she cannot straighten them all the way out on her own. Plaintiff claimed that both of her arms are very weak, and that she cannot hold her arms *Page 4 
out in front of her in a Frankenstein-type way for any period of time without getting severely fatigued.
7. Dr. Fred Ortmann, IV, an orthopedist, first evaluated Plaintiff on November 6, 2007. On that date, Dr. Ortmann stated that Plaintiff had "pain somewhat out of proportion to exam." In his deposition testimony, he elaborated, "I couldn't find anything on exam to suggest why she had such a high pain component, and when I cannot find that objectively, I tend to use that comment, in that I could not, myself, find something to explain her pain level." During the examination, Plaintiff claimed she could not flex her thumb, index, and long fingers. However, with time she was able to do it. Regarding this, Dr. Ortmann testified, "It brings into the question of the active participation of the patient."
8. Dr. Ortmann gave Plaintiff a note to return to light duty work as to her right hand only. He did not believe she needed to be out of work altogether.
10. Since it was unclear at the first visit what was causing the reported pain in Plaintiff's hand and fingers, Dr. Ortmann recommended nerve tests for Plaintiff's right arm. The nerve tests indicated Plaintiff was suffering from a problem with the median nerve in her forearm. Therefore, Dr. Ortmann recommended an MRI. Dr. Ortmann testified that the MRI confirmed "that there was nothing that was structurally wrong in the region of the forearm . . . to help explain her symptoms."
11. Dr. Ortmann testified that the physician who performed the EMG and nerve conduction studies found that Plaintiff had excellent range of motion in her wrist and elbow; had some swelling in her right hand which was due to her own disuse of the hand; that the majority of the upper muscles in Plaintiff's arm and shoulder above her elbow were normal; that Plaintiff did not have a brachial plexus injury; there was no evidence of cervical radiculopathy; and that *Page 5 
Plaintiff did not have peripheral neuropathy of the right upper extremity. The only finding that indicated a cause for concern was in Plaintiff's median nerve. However, the MRI of the forearm showed no lesions or compressions of the median nerve, nor any denervation of the median nerve itself. Finally, Dr. Ortmann did not think Plaintiff had any type of compressive neuropathy such as carpal tunnel syndrome.
12. Dr. Ortmann examined Plaintiff again on December 3, 2007 and diagnosed her with a "right median nerve injury." However, Dr. Ortmann testified "I could not explain to her why . . . all of her symptoms were occurring."
13. Dr. Ortmann was shown records from Plaintiff's initial period of treatment before seeing him. He was then asked whether the complaints in those records were consistent with those she made to him. His response was "I don't believe so," and he explained that her complaints there were different than those made to him.
14. When asked whether the alleged incidents at work caused Plaintiff to suffer a median nerve injury, Dr. Ortmann testified ". . . [I]f there is no prior history of injury to that hand and she had a normal hand prior to her examination and a normal nerve prior to her work-related claim, in my opinion it is at least as likely as not that she sustained some type of injury to her hand. . . ." However, Dr. Ortmann explained that he "had a hard time throughout" putting Plaintiff's symptoms and studies together. Dr. Ortmann then clarified that his thoughts on causation were limited "more to the symptoms that she was complaining about, not to — I could not determine how her actions would cause an injury to the nerve." When specifically asked whether he could say that Plaintiff's incident at work more likely than not caused her symptoms, Dr. Ortmann refused and stated "I would just leave it as to how I said it." *Page 6 
15. Dr. Vincent E. Paul, an orthopedic surgeon, examined Plaintiff on May 7, 2008, after her treatment with Dr. Ortmann at the request of Plaintiff's counsel. Dr. Paul agreed that it is "probably correct" that a doctor who sees a patient closer in time to the date of injury is in a better position to address the issue of causation.
16. Dr. Paul testified that, at the time he evaluated her, Plaintiff's complaints were limited to her hands, wrist and up into her right shoulder. Significantly, Dr. Paul testified that Plaintiff had "mottling" in both of her hands with very cold fingers on examination. Because it was in both hands, Dr. Paul conceded that the mottling in the left hand clearly was not caused by the incident at work, and "it probably is related to her smoking." He even agreed that this "mottling" was something Plaintiff probably had in both of her hands before her incident at work.
17. Throughout his testimony, Dr. Paul proposed a multitude of different possible conditions that Plaintiff might have, but he ultimately testified that, "It's hard to pinpoint to one spot." With regard to whether or not Plaintiff had some type of median nerve condition, Dr. Paul was unsure, stating, "I did say that, but I said only with qualifications with — you have to clear everything else off the table and restudy it." When asked whether the incidents that Plaintiff described at work caused "an injury" to her hand, Dr. Paul testified that he thought that it probably did. However, he was never able to pinpoint exactly what or where the injury was. Furthermore, he made clear that Plaintiff had a genetic predisposition, as well as a long history of smoking, that contributed to her problems.
18. Dr. Kapil Rawal, a neurologist, evaluated Plaintiff on December 19, 2008. From the description of the incident provided by Plaintiff, as well as her symptoms and Dr. Rawal's evaluation, Dr. Rawal testified that Plaintiff's alleged injury and progression of symptoms don't *Page 7 
"add up." Ultimately, Dr. Rawal was not able to form a diagnosis for Plaintiff. To a reasonable degree of medical certainty, Dr. Rawal testified, "To me it seems that more likely than not [Plaintiff's symptoms are] not work related."
19. Upon consideration of the medical testimony provided, and giving greatest weight to the testimony of Dr. Ortmann as Plaintiff's treating physician, the Full Commission finds that Plaintiff has failed to establish by the greater weight of the evidence that she suffered an injury that is causally related to an incident occurring at work on October 3, 2007. Only Dr. Paul, the IME doctor selected by Plaintiff, offered a causation opinion favorable to Plaintiff. However when Dr. Paul's testimony is considered as a whole, the Full Commission finds his causation opinion to be speculative in light of his inability to determine what, if any, injury Plaintiff suffered.
 ***********
Based upon the competent evidence of record, the Full Commission makes the following:
 CONCLUSION OF LAW
1. For an injury to be compensable, it must be an injury by accident arising out of and in the course of the employment. N.C. Gen. Stat. § 97-2(6). "Where the exact nature and probable genesis of a particular type of injury involves complicated medical questions far removed from the ordinary experience and knowledge of laymen, only an expert can give competent opinion evidence as to the cause of the injury." Click v. Pilot FreightCarriers, Inc., 300 N.C. 164, 265 S.E.2d 389 (1980). In the present case, the greater weight of the competent medical evidence of record fails to establish that Plaintiff suffered any injury that is causally related to an incident occurring at work on October 3, 2007.
 *********** *Page 8 
Based upon the foregoing Stipulations, Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 ORDER
1. Plaintiff's claim for compensation under the North Carolina Workers' Compensation Act must be, and is, hereby, DENIED.
2. Each side shall bear its own costs.
This the ___ day of February, 2010.
 S/___________________ PAMELA T. YOUNG CHAIR
CONCURRING:
 S/___________________ DIANNE C. SELLERS COMMISSIONER
 S/___________________ STACI T. MEYER COMMISSIONER *Page 1